IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERNEST PORTER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 17-763 |
| | ) | Magistrate Judge Maureen P. Kelly |
| v. | ) | |
| | ) | Re: ECF Nos. 52 and 54 |
| PENNSYLVANIA DEPARTMENT OF | ) | |
| CORRECTIONS, JOHN E. WETZEL, | ) | |
| ROBERT GILMORE, and JOHN/JANE | ) | |
| DOES, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

**KELLY, Magistrate Judge**

Plaintiff Ernest Porter ("Porter"), an inmate at the State Correctional Institution at Greene ("SCI – Greene") has presented a counseled civil rights complaint pursuant to 42 U.S.C. § 1983, which he has been granted leave to prosecute without prepayment of costs. Porter alleges that Defendants Robert Gilmore, the Pennsylvania Department of Corrections ("DOC"), and John E. Wetzel (collectively, "Defendants") have violated his rights provided by the Eighth and Fourteenth Amendments to the United States Constitution by continuing to confine him in the Capital Case Unit ("CCU") even though his sentence of death has been vacated.

Presently before the Court are a Motion for Summary Judgment filed on behalf of Defendants, ECF No. 52, and a Motion for Summary Judgment filed on behalf by Porter, ECF No.

54. For the reasons that follow, the Motion for Summary Judgment filed by Defendants is granted and the Motion for Summary Judgment filed by Porter is denied. [1]

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Status of Plaintiff's Sentence

Over thirty-three years ago, on April 27, 1985, Porter robbed and murdered Raymond Fiss as Fiss was opening his beauty shop in Philadelphia, Pennsylvania.  Porter was convicted of, *inter alia*, murder in the first degree on June 27, 1986, in the Court of Common Pleas of Philadelphia County, Pennsylvania, and subsequently sentenced to death.  ECF No. 55 ¶ 37.  His conviction and sentence were subsequently affirmed by the Supreme Court of Pennsylvania on February 8, 1990.  Commonwealth v. Porter, 569 A.2d 942 (Pa. 1990); ECF No. 55 ¶ 38.

On March 23, 1995, Porter filed a petition for relief under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. C.S.A. §§ 9541 *et seq.*  See Commonwealth v. Porter 728 A.2d 890 (Pa. 1999).  The PCRA petition was denied in the trial court and the denial was affirmed on appeal. Id.; ECF No. 55 ¶ 39. Porter filed a timely Petition for Writ of Habeas Corpus in the United States District Court for the Eastern District of Pennsylvania on May 25, 1999. On June 26, 2003, the District Court granted in part and denied the habeas petition.  Porter v. Horn, 276 F. Supp. 2d 278, 364-65 (E.D. Pa. 2003), ECF No. 55 ¶ 41.  Specifically, the District Court granted relief with respect to Plaintiff's sentence of death, which was vacated, but denied the petition in all other respects:

AND NOW, this 26th day of June 2003, upon consideration of Petitioner's Petition

for Writ of Habeas Corpus (Doc No. 14), all Responses and Replies thereto, all

---

[1]  In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties voluntarily consented to having a United States Magistrate Judge conduct all proceedings in this case, including the entry of a final judgment. ECF Nos. 3, 17.

documents filed in support thereof an in opposition thereto, the record of Petitioner's case in state court, the expanded record, and evidence presented at the evidentiary hearing, it is hereby ORDERED, consistent with the foregoing opinion, that:

1. Petitioner Ernest Porter's Petition for Writ of Habeas Corpus is GRANTED as to Claim V, which related to the Court's determination that there is a reasonable likelihood the jury interpreted the penalty phase jury instructions and verdict form in a way that prevented the consideration of constitutionally relevant evidence;

2. the Petition is DENIED in all other respects;

3. Petitioner's death sentence is VACATED;

4. the execution of the writ of habeas corpus is STAYED for 180 days from the date of this Order, during which period the Commonwealth of Pennsylvania may conduct a new sentencing hearing in a manner consistent with this opinion;

5. after 180 days, should the Commonwealth of Pennsylvania not have conducted a new sentence hearing, the writ shall issue and the Commonwealth shall sentence Petitioner to life imprisonment;

6. in accordance with 29 U.S.C. § 2253, a certificate of appealability is GRANTED to Petitioner regarding Claims III, IV, VI, VII, VIII, XII, XIII and XIV; and

7. if either Petitioner or Respondents file an appeal to the United States Court of Appeals for the Third Circuit, the entry of this Order will be stayed pursuant to Eastern District of Pennsylvania Local Rule 9.4 (12) pending the disposition of that appeal.

BY THE COURT:

ROBERT F. KELLY, SR. J.

No. 99-2677 (E.D. Pa. June 26, 2003), ECF No. 109 at 136-137 (the "Stay Order").

Thereafter, on August 11, 2003, and August 20, 2003, both Porter and the Commonwealth filed separate appeals to the United States Court of Appeals for the Third Circuit at Docket Nos.

03-9006 and 03-9007, respectively. ECF Nos. 55-1 at 57, 69. As relevant to this matter, the Commonwealth appealed the portion of the Order vacating Porter's death sentence, and Porter appealed the denial of relief as to his underlying conviction. In accordance with Paragraph 7 of the Stay Order, the filing of these two appeals resulted in a stay of the entry of the Order vacating Porter's sentence of death.

On February 12, 2004, Porter filed a motion to stay the briefing schedules in both appeals, pending a decision by the United States Supreme Court in Banks v. Horn, No. 02-1603, 124 S. Ct. 45 (2003). ECF No. 55-1 at 71. The United States Court of Appeals for the Third Circuit granted Porter's unopposed motion and entered an order on February 12, 2004, staying the briefing schedules. The briefing schedule stay was lifted on September 8, 2004, following the Supreme Court's decision in Banks.

As set forth in this Court's prior Memorandum Order relative to Porter's Motion for Preliminary Injunction, the appeal was again delayed:

> Although the stay was lifted on September 8, 2004, following the Supreme Court's decision in Banks, Plaintiff subsequently filed two motions on October 22, 2004, and October 27, 2004, respectively, asking that the briefing schedules be temporarily tolled pending the disposition of two other cases then pending in the United States Supreme Court. [ECF No. 55-1 at 60, 72]. Plaintiff subsequently withdrew one of those requests and, following the Supreme Court's decision in the second case, the briefing schedules on Plaintiff's cases were reinstated. [Id.] Plaintiff, however, filed four motions seeking an extension of time of 60 days each to file his brief and appendix, which were all granted. Id. Then, on November 9, 2006, Plaintiff filed a Motion asking to hold the appellate proceedings in abeyance pending the Pennsylvania Supreme court's disposition of Plaintiff's Petition for State Post-Conviction Relief filed on August 16, 2002, wherein he raised a claim under Atkins v. Virginia, 536 U.S. 304 (2002). [ECF No. 55-1 at 61, 73]. That motion was granted by the Third Circuit Court of Appeals on February 7, 2007, with the added directive that the parties were to file status reports regarding the PCRA proceedings every 60 days until the conclusion of the state proceedings. [ECF No. 55-1 at 61-62, 73]. [….] (It should be noted here that Plaintiff supplemented his PCRA Petition on June 15, 2006, raising a claim under Brady v. Maryland, 373 U.S. 83 (1963). Although the PCRA court issued a ruling dismissing the PCRA Petition on November 8, 2007, it did so finding that it was

4

time-barred and did not meet the requirement of <u>Brady</u> material. <u>Com. v. Porter</u>, 35 A.3d 4, 7-11 (Pa. 2012). The PCRA court did not address the <u>Atkins</u> issue and that portion of the PCRA Petition remains pending. *Indeed, in its opinion affirming the denial of post-conviction relief, the Pennsylvania Supreme Court directed the PCRA court "to promptly dispose of appellant's long-pending prior PCRA petition, which raised an issue under <u>Atkins</u> ...."* <u>Id.</u> at 7).

<u>Porter v. Pennsylvania Department of Corrections</u>, No. 17-763, 2017 WL 4099784 at *2 *n*.2 (W.D. Pa. Sept. 15, 2017) (italics added).

In its directive to the trial court to resolve Porter's <u>Atkins</u>-related PCRA petition expeditiously, the Pennsylvania Supreme Court observed that the procedural delay resulted from a counseled strategy of filing serial PCRA petitions during the pendency of federal habeas review, and requesting stays in both state and federal court. "The point is simple and fundamental, obscured here only by the fact that federal counsel's strategy – pursued in both state and federal court – has been to avoid having any of appellant's collateral claims decided any time soon. This is a legally dubious, but common, strategy peculiar to certain capital defense counsel, who view delay as an end in itself for those condemned under a sentence of death." <u>Commonwealth v. Porter</u>, 35 A.3d 4, 15 (Pa. 2012). The Court acknowledged that proceeding with a meritorious <u>Atkins</u> claim had consequences, "including conditions of incarceration, which specifically counsel against the deferral of legitimate death eligibility claims." <u>Id.</u> at 17. Accordingly, "[t]here simply is no legitimate reason to defer decision of an <u>Atkins</u> claim, unless it lacks merit." <u>Id.</u>

Despite the above-noted 2012 Order of the Pennsylvania Supreme Court, the latest status report filed with the Third Circuit on June 12, 2018, indicates that Plaintiff's <u>Atkins</u>-related PCRA petition remains pending before the Court of Common Pleas of Philadelphia County. Porter's appointed *habeas* counsel represents that he continues to discuss settlement of this matter with the Philadelphia District Attorney's Office. ECF No. 55 ¶ 47; <u>Porter v. Horn</u>, Nos. 03-9006 and 03-9007, ECF No. 003113057982 (3d Cir. October 11, 2018). As a result of this procedural stalemate,

the Commonwealth's appeal from the District Court's Order granting partial habeas relief with respect to Porter's death sentence remains pending in the Third Circuit, and the stay imposed by the District Court vacating Porter's death sentence is still in effect, some fifteen years later.

## B. Conditions of Confinement

Upon sentencing on June 27, 1986, Porter was placed in the custody of the Pennsylvania DOC and, pursuant to 61 Pa. C.S.A. § 4303, was assigned to solitary confinement in the Level 5 housing Capital Case Unit ("CCU") at SCI – Greene, a unit that houses death-row inmates.[2] ECF No. 55 ¶¶ 1, 21. Cells in the CCU are no larger than 7 feet by 12 feet, and are closed with a door that has two narrow vertical windows, measuring 5 ½ inches wide and 36 inches long. Id. ¶¶ 3, 4. The permanent fixtures in Porter's cell include a metal bed with a plastic mattress, a sink, toilet and desk. Id. ¶ 6.

As a CCU inmate, Porter spends the overwhelming majority of his time in his cell, including eating his meals alone. Id. ¶ 7. Porter is permitted to leave his cell for ten hours per week, two hours per day Monday through Friday. Id. ¶ 5. This includes time for basic hygiene, three showers per week, and for work duty. Id. ¶ 8. In addition, Porter is permitted to exercise in the open air five days per week. Id. ¶ 14. CCU exercise cages are no more than twice the size of a typical CCU cell, and one or two men are placed in an exercise area at the same time. Id. ¶¶ 15, 16. Porter is permitted one non-contact personal visit per week, and three telephone calls per week.

---

[2] The applicable Pennsylvania statute provides:

> [T]he secretary [of corrections] shall, until infliction of the death penalty ... keep the inmate in solitary confinement. During the confinement, no person shall be allowed to have access to the inmate without an order of the sentencing court, except the following:
> (1) The staff of the department.
> (2) The inmate's counsel of record or other attorney requested by the inmate.
> (3) A spiritual adviser selected by the inmate or the members of the immediate family of the inmate.

61 Pa. Cons. Stat. Ann. § 4303.

Id. ¶¶ 11, 13.  In addition, unless Porter specifically requests a mental health appointment, any medical or mental health consultations take place through his cell door, within listening range of prisoners in the surrounding cells.  Id.  ¶ 20.

On the occasions when Porter is permitted to leave his cell, he must undergo a visual strip search, and is handcuffed from behind, or handcuffed in front using a belt and tether.  Id.  ¶¶ 9, 10. Job assignments are limited to janitorial duties on the CCU block, and performed in confined small spaces under close observation and monitoring.  Id. ¶ 18.  CCU prisoners are permitted in-cell study, using personal workbooks and reading material, but are otherwise precluded from participation in adult basic education courses, vocational learning opportunities or the chance to work towards a high school diploma.  Id. ¶ 19.  In addition, Porter is not permitted to attend religious services with the general population, but may receive a daily visit from a religious leader, for discussions through the narrow windows of his door.  Id. ¶ 20.

Porter claims that as a result of the conditions of his confinement, he has suffered deterioration of his mental health, including "severe anxiety, depression, panic, paranoia, bipolar mood swings and sometimes suicidal impulses," for which he is prescribed anti-depressant medication.  ECF No. 9 ¶ 21.  In response to grievances related to Porter's continued detention in the CCU, Defendant Gilmore noted that Porter receives mental health services and indicated that additional services may be requested through Porter's counselor or the SCI-Greene Psychology Department.  ECF No. 9-7.  Delivery of mental health services occurs in a number of ways.  A psychology staff member is assigned to the CCU on a full-time basis.  ECF 55-2 at 59.  In addition, each CCU inmate receives weekly psychiatric visits, and can request additional services on an as-needed basis.  Id.  If an inmate is experiencing a mental health emergency, staff can arrange for off-duty consultation with medical staff.  When a CCU inmate is identified as decompensating, he

or she can be placed into a Diversionary Treatment Unit ("DTU") for interactive therapy or a mental health unit on a temporary basis. Id. at 59-60.

There is no evidence in the record before this Court that Porter required or requested (and did not receive) additional mental health services or placement in a specialized housing unit for mental health purposes. Further, there is no evidence of record that either Defendant Wentz or Defendant Gilmore were aware that available mental health treatment was insufficient for Porter's claimed mental health diagnoses.

It is undisputed that over the course of Porter's thirty-two years of solitary confinement, Porter has never been cited for disciplinary misconduct. ECF No. 55 ¶ 29. Despite his unremarkable behavior, and solely because of the status of his death sentence, the parties further agree that Porter "lacks the opportunity to earn additional privileges" to further demonstrate his ability to self-manage his behavior. Id. ¶ 30. DOC Policy DC-ADM 802 does not provide prisoners in the CCU with the opportunity to challenge prolonged placement in solitary confinement. Id. ¶ 31.

### C.    Porter's Claims

In Williams v. Sec'y Pennsylvania Dep't of Corr., 848 F.3d 549 (3d Cir. 2017), the United States Court of Appeals for the Third Circuit recognized that "[i]nmates in solitary confinement on death row without active death sentences face the perils of extreme isolation and are at risk of erroneous deprivation of their liberty." Id. at 574. "Accordingly, they have a clearly established due process right under the Fourteenth Amendment to avoid unnecessary and unexamined solitary confinement on death row. The State must therefore afford these inmates procedural protections that ensure that continuing this level of deprivation is required for penological purposes, and is not reflexively imposed without individualized justification." Id.

Citing Williams, Porter brings this action, asserting that his death sentence has been vacated, and thus his continued incarceration in the CCU violates his procedural and substantive due process rights under the Fourteenth Amendment. In addition, based upon the conditions of his allegedly wrongful confinement in the CCU, Porter asserts that his incarceration has subjected him to cruel and unusual punishment in violation of the Eighth Amendment. In his Complaint, ECF No. 9, Porter seeks declaratory relief in the form of a declaration that his constitutional rights have been violated, and claims that as a result of his wrongful confinement to death row, he is entitled to compensatory and punitive damages.[3] ECF No. 9 ¶¶ 32, 37, 42, 47, 52.

After extensive discovery, including the deposition of appropriate prison personnel and the exchange of an expert report regarding the alleged absence of legal justification for Porter's long-term solitary confinement, Porter now moves for the entry of summary judgment in his favor with regard to his Fourteenth Amendment procedural and substantive due process claims. ECF Nos. 54, 56.

Defendants respond that Williams is specifically limited to situations where a sentence has been vacated and all that remains is a resentencing hearing. According to Defendants, in this case, the order vacating Porter's sentence was stayed for purposes of appeal and so, by operation of law, his sentence of death remains in effect. Under these circumstances, Defendants contend that no procedural or substantive due process violation has occurred, and Pennsylvania law requires Porter's continued confinement in the CCU. In addition, to the extent Porter alleges an Eighth Amendment conditions of confinement claim arising from the impact of long-term solitary

---

[3] In response to Defendants' Motion for Summary Judgment, Porter voluntarily withdraws his equal protection claims against all parties, as well as all claims against the Pennsylvania Department of Corrections. ECF No. 60 at 14-15. Accordingly, summary judgment is entered in favor of Defendant Pennsylvania Department of Corrections as to all claims, and in favor of Defendants Wetzel and Gilmore with respect to Porter's Fourteenth Amendment equal protections claims.

confinement upon his mental health, Defendants contend that Porter failed to properly exhaust this claim as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). Defendants further argue that pursuant to Section 1983, Porter has not sufficiently alleged or established the personal involvement of Defendants Wetzel and Gilmore in the deprivations at issue and has otherwise failed to muster evidence sufficient to establish that his Eighth Amendment rights have been violated. Finally, Defendants contend that if the Court concludes that Porter's substantive or procedural due process rights have been violated, each is shielded from liability as to all claims by application of the doctrine of qualified immunity because Williams has not been applied previously to situations where an order vacating a sentence of death is stayed pending appeal. In support of each of these arguments, Defendants seek the entry of summary judgment as to all pending claims. ECF No. 52.

The parties have filed extensive briefs and exhibits in support and in opposition to the pending Motions for Summary Judgment, ECF Nos. 53, 55, 56, 59, 60 and 62, and the Motions are ripe for review.

## II.    STANDARD OF REVIEW

Summary judgment may only be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Pursuant to Rule 56, the court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A motion for summary judgment will only be denied when there is a genuine issue of material fact, i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. McGreevy v. Stroup, 413 F.3d 359, 363 (3d Cir. 2005). The mere existence

of some disputed facts is insufficient to defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

In determining whether the dispute is genuine, the court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. The court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. McGreevy, 413 F.3d at 363; Simpson v. Kay Jewelers, 142 F.3d 639, 643 n.3 (3d Cir. 1998) (citing Fuentes v. Perskie, 32 F.3d 759, 762 *n*.1 (3d Cir. 1994)). In evaluating the evidence, the court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. Watson v. Abington Twp., 478 F.3d 144, 147 (3d Cir. 2007). As to materiality, the relevant substantive law identifies which facts are material. Anderson, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. "Factual disputes that are irrelevant or unnecessary will not be counted." Id. Further, inferences based upon speculation or conjecture do not create a material factual dispute sufficient to defeat a motion for summary judgment. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 *n*.12 (3d Cir. 1990).

As indicated, each party has moved for the entry of judgment as a matter of law. However, the standards under which a court grants or denies each party summary judgment do not change by virtue of cross-motions being presented. Home for Crippled Children v. Prudential Insurance Co., 590 F. Supp. 1490, 1495 (W.D. Pa. 1984). "On cross-motions for summary judgment, the law in our Circuit is clear—the Court considers each Motion on its own merits, tested against the standards of [Federal Rule of Civil Procedure 56]." U.S. Equal Employment Opportunity Comm'n v. Bob Evans Farms, LLC, 275 F. Supp. 3d 635, 639 (W.D. Pa. 2017) (internal citations omitted).

### III.  DISCUSSION

#### A.  Procedural Due Process Claim - Liberty Interest

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." Wilkinson v. Austin, 545 U.S. 209, 221 (2005). A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' … or it may arise from an expectation or interest created by state laws or policies." Id. (internal citations omitted).   The United States Supreme Court has recognized that with respect to adverse conditions of confinement, the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement, because "confinement … is within the normal limits or range of custody which [a] conviction has authorized the State to impose." Id., quoting Meachum v. Fano, 427 U.S. 215, 225 (1976).  Accordingly, "[t]he Due Process Clause standing alone confers no liberty interest in freedom from state action taken within the sentence imposed." Sandin v. Conner, 515 U.S. 472, 480 (1995). However, a state-created liberty interest in avoiding freedom from restraint may arise from state policies or regulations "which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Wilkinson, 545 U.S. at 222–23; and see Williams, 848 F.3d at 559.  Where a sufficient liberty interest is at stake, the Due Process Clause requires meaningful procedural protections to permit periodic individualized assessment of the asserted penological justification supporting continued exposure to atypical conditions.

In the instant case, Porter contests the validity of continuous confinement on death row as imposing an atypical and significant hardship, and therefore a violation of his Fourteenth

Amendment due process rights due to the absence of an individualized assessment justifying the need for his placement.

Porter's due process claims rely in large part upon the application of the precedential opinion of the United States Court of Appeals for the Third Circuit in Williams, where after a lengthy review of the conditions faced by inmates in the Pennsylvania DOC's CCU and the "robust body of scientific research" on the effects of solitary confinement, the Third Circuit unequivocally concluded that *with respect to inmates awaiting resentencing and no longer subject to active death sentences*, the Fourteenth Amendment requires procedural protections to ensure that continued confinement to death row is imposed for legitimate penological purposes. Williams, 848 F.3d at 573. The Third Circuit went on to explain, "scientific research and the evolving jurisprudence has made the harms of solitary confinement clear: Mental well-being and one's sense of self are at risk. We can think of few values more worthy of constitutional protection than these core facets of human dignity." Id. at 574. The Third Circuit made "clear what prison officials should have already known: those no longer subject to the death penalty … have a due process right to be free from indefinite conditions of solitary confinement." Id. at 574-75.[4]

In reaching its decision in Williams, the Third Circuit repeatedly acknowledged that it was not deciding the issue of whether an inmate with an "active" death sentence had a liberty interest that precluded confinement on death row without regular review. In footnote 2, the Third Circuit noted that "Plaintiffs have both had their death sentences vacated but were nevertheless detained in solitary confinement on death row. We take no position on whether any inherent risk posed by inmates whose death sentences are still active and viable is sufficient to raise a presumption that

---

[4] The two plaintiffs in Williams were in a significantly different position than Porter. There, the death sentences of the two inmates were vacated but the inmates were kept in solitary confinement six and eight years, respectively, until they were finally resentenced to life imprisonment and placed in general population.

their continued confinement on death row is justifiable." Id. at 553 *n*.2. The Court summarized its holding as follows: "the Due Process Clause of the Fourteenth Amendment … limits the State's ability to subject an inmate to the deprivations of death row once the death sentence initially relied upon to justify such extreme restrictions is no longer operative." Id. at 552. So defined and limited, if the June 26, 2003 Stay Order renders Porter's death sentence still "active," Williams informs but is not dispositive as to Porter's due process claim, for it acknowledges the "State's ability to subject an inmate to the deprivations of death row." Id.

The State's authority derives from Pennsylvania statutory provisions requiring that inmates sentenced to death be subject to solitary confinement, with access to only staff of the department, the inmate's counsel of record, and a spiritual advisor. 61 Pa. C.S.A. § 4303. See *fn*. 2, supra. For those inmates with an active death sentence, solitary confinement until death is a component of the sentence imposed, and accordingly cannot give rise to the requisite expectation or interest in typical conditions of confinement enjoyed by general population inmates to support a Fourteenth Amendment claim. Williams, 848 F.3d at 569 ("[h]owever, [with regard to inmates confined to death sentences that had not been vacated], those inmates were all confined pursuant to death sentences that had not been vacated. Accordingly, confinement on death row was not a significant or atypical hardship for them. Rather, it was expressly within the "expected perimeters of the sentence imposed.").

Further, through his pending post-conviction appeals, Porter continues to be afforded the opportunity to challenge his death sentence and the terms of his confinement. This factor is particularly relevant given the relief sought through his pending due process claim; *i.e.*, procedural protections to permit examination of the propriety of his confinement on death row. Under these

circumstances, it cannot be said that Porter has been deprived of a liberty interest without adequate process.

That said, if Porter is subject to a vacated death sentence that is no longer "active," then his claim falls squarely within <u>Williams</u>, and he has an established due process right to be free from indefinite conditions of solitary confinement without periodic examination of the reasons for continued placement on death row. Accordingly, the Court next considers the effect of the June 26, 2003 Stay Order to determine whether Porter has established a viable procedural due process claim.

### B. Procedural Due Process Claim - Effect of Stay Order

As explained by the United States Supreme Court in <u>Nken v. Holder</u>, 556 U.S. 418 (2009),

> It takes time to decide a case on appeal. Sometimes a little; sometimes a lot. "No court can make time stand still" while it considers an appeal, <u>Scripps–Howard Radio, Inc. v. FCC</u>, 316 U.S. 4, 9, 62 S.Ct. 875, 86 L.Ed. 1229 (1942), and if a court takes the time it needs, the court's decision may in some cases come too late for the party seeking review. That is why it "has always been held, ... that as part of its traditional equipment for the administration of justice, a federal court can stay the enforcement of a judgment pending the outcome of an appeal." <u>Id.</u>, at 9–10, 62 S.Ct. 875 (footnote omitted). A stay does not make time stand still, but does hold a ruling in abeyance to allow an appellate court the time necessary to review it.

<u>Nken</u>, 556 U.S. at 421. In contrast to an injunction, "a stay operates upon the judicial proceeding itself. It does so either by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability. See <u>Blacks [Law Dictionary]</u> at 1413 (6th ed. 1990) (defining 'stay' as 'a suspension of the case or some designated proceedings within it.')." <u>Id.</u> at 428.

The United States Supreme Court went on to distinguish between a stay pending appeal and injunctive relief with regard to whether an order is presently viable:

> A stay pending appeal certainly has some functional overlap with an injunction, particularly a preliminary one. Both can have the practical effect of preventing

some action before the legality of that action has been conclusively determined. But a stay achieves this result by temporarily suspending the source of authority to act—the order or judgment in question—not by directing an actor's conduct. A stay "simply suspend[s] judicial alteration of the status quo," while injunctive relief "grants judicial intervention that has been withheld by lower courts."

Id. at 428–29.

In this case, Porter contends that the Stay Order vacating his death sentence places him in the identical procedural posture of the vacated death sentences at issue in Williams, supra, where both plaintiffs' death sentences had been vacated, and the trial court awarded each of them a new penalty hearing. ECF No. 56 at 10-12. However, in both cases, the State did not appeal the portion of the Order vacating the sentences of death. Williams, 848 F.3d at 555-56. Given the State's failure to appeal the court's invalidation of the death sentences, neither prisoner was subject to a stay of an active sentence of death during the pendency of the appeals. Here, the District Court stayed its order vacating Porter's death sentence pending the specific appeal of the death sentence portion of the order by the State which, pursuant to Nken, temporarily suspended "the source of authority to act—the order or judgment in question." Nken, 556 U.S. at 428-29. As such, the Stay Order at issue here returns the matter "to the status quo – the state of affairs before the … order was entered." Id. Accordingly, the Stay Order did not achieve what Porter represents; rather, Porter's sentence of death remains unaltered pending the disposition of his federal appeal. Because Porter is the subject of an active death sentence, Defendants are entitled to the entry of judgment in their favor as to Porter's Fourteenth Amendment procedural due process claim. [5]

---

[5] If the stay of the order vacating Porter's death sentence is lifted, effectively resulting in the entry of the Order vacating his death sentence, then Porter will no longer be subject to an active death sentence. At that time, Porter would have the Fourteenth Amendment procedural due process right to avoid "unnecessary and unexamined solitary confinement" as recognized by Third Circuit in Williams.

### C. Substantive Due Process Claim

Porter seeks the entry of summary judgment in his favor with regard to a Fourteenth Amendment substantive due process claim, based upon his contention that Defendants' indifference to the mental and physical impact of long-term solitary confinement is arbitrary and shocks the conscience. ECF No. 56 at 15-16. In their cross-motion for summary judgment, Defendants argue that Porter's substantive due process claim is barred by the "explicit source rule," because the challenged conduct is properly addressed by the protections afforded under the Eighth Amendment and Porter has not established an independent basis for his Fourteenth Amendment substantive due process claim. The Court agrees.

In Betts v. New Castle Youth Development Center, the United States Court of Appeals for the Third Circuit explained the rule as follows:

> Noting its "reluctan[ce] to expand the concept of substantive due process," the Supreme Court has established the "more-specific-provision rule." County of Sacramento v. Lewis, 523 U.S. 833, 843–44, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Under this rule, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." United States v. Lanier, 520 U.S. 259, 272 n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (clarifying prior holing in Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). The Supreme Court explained the rationale behind the rule for Eighth Amendment claims in Whitley v. Albers, where a prisoner shot in the leg during a prison riot filed both Eighth Amendment and Fourteenth Amendment substantive due process claims against prison officials:
>
> > [T]he Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners in cases such as this one, where the deliberate use of force is challenged as excessive and unjustified. It would indeed be surprising if, in the context of forceful prison security measures, "conduct that shocks the conscience" or "afford[s] brutality the cloak of law," and so violates the Fourteenth Amendment, were not also punishment "inconsistent with contemporary standards of decency" and "'repugnant to the conscience of mankind,'" in violation of the Eighth.... [I]n these circumstances the Due Process

> Clause affords respondent no greater protection than does the Cruel and Unusual Punishments Clause.
>
> 475 U.S. at 327, 106 S.Ct. 1078 (internal citations omitted). Compare with County of Sacramento, 523 U.S. at 843, 118 S.Ct. 1708 (rejecting application of more-specific-provision rule to substantive due process claim arising from high speed police chase because facts were not within "search and seizure" protections of Fourth Amendment).

Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 260 (3d Cir. 2010). In this instance, Porter contends that he has a "due process liberty interest in avoiding the harsh conditions of solitary confinement." ECF No. 62 at 4. As defined by him, Porter's substantive due process claims for relief under the Fourteenth Amendment challenge the same conduct and conditions at issue under his Eighth Amendment "cruel and unusual punishment" claim; in particular, Defendants' deliberate indifference to the physical and psychological harms caused by long term solitary confinement. Porter's substantive due process claim therefore is "covered" by the Eighth Amendment, and Porter is foreclosed from simultaneously pursuing a substantive due process claim. Therefore, Defendants' Motion for Summary Judgment is granted on this basis.

### D. Eighth Amendment Claim

Porter also presents an Eighth Amendment claim, challenging the extraordinary conditions faced by him as an inmate confined in the CCU on Pennsylvania's death row. Defendants seek entry of judgment in their favor as a matter of law because: (1) Porter failed to file a grievance specifically challenging his conditions of confinement on death row and therefore failed to exhaust his claim as required by the PLRA; (2) there is no evidence of the personal involvement of either Defendant in the creation or imposition of the conditions at issue; and, (3) Porter fails to establish that he has been deprived of any of "the minimal civilized measure of life's necessities." ECF No. 53 at 14-24. For the reasons that follow, the Court denies Defendants' Motion for Summary Judgment on the basis of exhaustion and personal involvement, but finds that Porter has not

presented evidence to establish that Defendants were deliberately indifferent to a known substantial risk of serious harm to Porter's mental health due to the availability of substantial psychological care, and the dearth of evidence that either Defendant was aware that the care afforded to Porter was insufficient.

### 1. Exhaustion

The PLRA, 42 U.S.C. § 1997(e)(a), provides as follows:

No action shall be brought with respect to prison conditions under section 1983 of this title by a prisoner confined in jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

The PLRA also mandates "proper exhaustion" of all the agency's deadlines and other procedural rules pertaining to its administrative remedy process. Woodford v. Ngo, 548 U.S. 81, 93 (2006). "'[P]rison grievance procedures supply the yardstick' for determining what steps are required for exhaustion." Williams v. Beard, 482 F.3d 637, 639 (3d Cir. 2007) (quoting Spruill v. Gillis, 372 F.3d 218, 230 (3d Cir. 2004)). "[T]o properly exhaust administrative remedies, prisoners must 'complete the administrative review process in accordance with the applicable procedural rules'" as they are "defined ... by the prison grievance process itself." Jones v. Bock, 549 U.S. 199, 218 (2007) (quoting Ngo, 548 U.S. at 93). "[I]t is the prison's [administrative remedy] requirements, and not the PLRA, that define the boundaries of proper exhaustion." Id. at 218. Failure to comply substantially with the procedural requirements of the applicable prison's grievance system will result in a procedural default of the claim. Spruill, 372 F.3d at 227–32; see also Williams, 482 F.3d at 639 (inmate "procedurally defaulted" when he failed to comply with the requirements of the prison's grievance procedures). Of particular relevance here, "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the

boundaries of proper exhaustion." Jones v. Bock, 549 U.S. at 218.  In making this determination, "exhaustion is a question of law to be determined by a judge, even if that determination requires the resolution of disputed facts." Small v. Camden Cty., 728 F.3d 265, 269 (3d Cir. 2013).

The procedural requirements of the DOC Inmate Grievance System are set forth in Policy DC-ADM 804 and, as relevant here, require an inmate to present a signed and dated grievance containing the following information:

> The text of the grievance must be legible, understandable, and presented in a courteous manner.  The inmate must include a statement of the facts relevant to the claim.
>
> a. The statement of facts shall include the date, approximate time, and location of the events(s) that gave rise to the grievance.
>
> b. The inmate shall identify individuals directly involved in the event(s).
>
> c. The inmate shall specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, court orders, or other law.
>
> d. If the inmate desires compensation or other legal relief normally available from a court, the inmate must request the specific relief sought in his/her initial grievance.

ECF No. 55-2 at 145 (DC-ADM 804.1.A.11).  On March 2, 2017, Porter submitted Inmate Grievance No. 666916, stating a follows:

> In accordance with the new recent Third Circuit Court Order in "Craig Williams v. Dept. of Corrections", where (they) the Court made it clear that all inmates currently on death row that no-longer have a current legal death sentence should be removed from death row!! Sadly, I am one of those inmates, and I have requested to be removed from death row and allowed to move into general population.
>
> However, to date I have not been removed from death row, and is illegally being subjected to solitary confinement on death row.  For which, failure from this day forward to heel to the Court Order, I will sue the D.O.C. $5,000.00 for each day I remain illegally on Death row.

Id. at 177 (emphasis in original). Porter received an initial decision denying his grievance and request for relief, stating that while the DOC was aware of the Court's decision, no change in DOC policy had yet been announced. Id. at 179. The response further indicated that Porter was receiving available mental health services, and that additional services were available if requested. Id. Porter appealed the denial of his grievance to Defendant Gilmore, in his role as Superintendent of SCI – Greene, and received a decision affirming the initial response. Porter submitted an appeal to final review with the DOC Secretary's Office of Inmate Grievances and Appeals ("SOIGA"), stating that he suffered declining mental health as a result of the conditions of his confinement, and requesting an immediate transfer to general population. Id. at 180-188.

Defendants argue that despite Porter's compliance with the administrative review process, he failed to exhaust his Eighth Amendment claim related to confinement on death row because his grievance challenging continued confinement in the CCU does not specifically invoke the phrase "Eighth Amendment" or detail the allegedly cruel conditions of confinement. This argument fails. Neither the prison's grievance process nor legal precedent requires inmates to identify the precise legal theory or statutory source of a claim, but merely to state the claim he or she wishes to raise "concerning violations of Department directives, regulations, court orders, or other law." Id. at 145. Porter plainly and clearly stated that he was "illegally being subjected to solitary confinement on death row." Id. at 177. In the grievance appeal process, he stated that he was "suffering the deprivation associated with death row," and that his "mental pain and suffering continues." These allegations were certainly sufficient to provide prison officials notice of the basis of his claim, and a fair opportunity to address the underlying issue; i.e., Porter's solitary confinement was causing him harm. Notably, beginning with the initial response to Porter's grievance, prison officials including Defendant Gilmore reminded Porter that "a broad continuum of mental health services

is available to every inmate, regularly," id. at 179, and that if he felt the need for additional services, he should notify his counselor and/or the psychology department. Id. at 183. Based upon these statements, it is clear that prison officials understood the scope of Porter's grievance as including the imposition of conditions of confinement causing or likely to cause harm to Porter's mental well-being. Under these circumstances, Porter has appropriately exhausted administrative remedies with regard to his Eighth Amendment claim, and Defendants' Motion for Summary Judgment on this basis is denied. See e.g., Brownell v. Krom, 446 F.3d 305, 310 (2d Cir. 2006) ("In determining whether exhaustion has been achieved, we have drawn an analogy between the contents of an administrative grievance and notice pleading, explaining that '[a]s in a notice pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming.'" Id., quoting Strong v. David, 297 F.3d 646, 650 (7th Cir. 2002)).

## 2. Personal Involvement

To maintain a claim pursuant to 42 U.S.C. § 1983, each individual defendant "'must have personal involvement in the alleged wrongdoing.'" Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode, 845 F.2d at 1207. In this instance, Defendants contend that summary judgment is appropriate because Porter has failed to establish that either Wetzel or Gilmore was personally involved in the complained of violations of his Eighth and Fourteenth Amendment rights.

The United States Court of Appeals for the Third Circuit recognizes two theories of supervisory liability: first, individuals who are policymakers may be liable under Section 1983 if it is shown they "with deliberate indifference to the consequences, established and maintained a

policy, practice or custom which directly caused the constitutional harm;" and, second, a supervisor may be personally liable under Section 1983 if he "participated in violating the plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in his subordinates' violations." A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004); Parkell v. Danberg, 833 F.3d 313, 330 (3d Cir. 2016).

In this instance, it is apparent that the DOC policy at issue, establishing the challenged conditions of confinement in the CCU, was implemented at the direction of Defendant Wetzel, as Secretary of the DOC. See, e.g., Hall v. Wetzel, No. 17-cv-4738, 2018 WL 1035780 (E.D. Pa. Feb. 22, 2018) (district court recognizing Defendant Wetzel's role as Secretary of the DOC and therefore responsible for establishing and implementing CCU policy); Shoatz v. Wetzel, No. 13-cv-0657, 2016 WL 595337 (W.D. Pa. Feb. 12, 2016) (Defendant Wetzel acknowledged his role as the sole decision-maker regarding the plaintiff's solitary confinement); Johnson v. Wetzel, 209 F. Supp. 3d 766, 779 (M.D. Pa. 2016) ("The record reflects that Secretary Wetzel knows well the risks inherent in prolonged isolation. Secretary Wetzel agreed that 'long term' solitary confinement 'certainly could' have negative effects on mental health and that Johnson's thirty-six year confinement is 'certainly' considered long term.… Moreover, Secretary Wetzel stated that he is familiar with the work of Dr. Haney, which sets forth at length the harmful effects of solitary confinement. The court finds that Secretary Wetzel—the only defendant with authority to remove Johnson from the RRL—knew of the significant mental health risks attending extended isolation."). In light of each of these prior federal court decisions recognizing Secretary Wetzel's role in implementing policies regarding the conditions of solitary confinement, Defendants' Motion for Summary on the basis of personal involvement as to Secretary Wetzel is denied.

Similarly, the evidence of record establishes that Defendant Gilmore has acknowledged his participation and acquiescence in Porter's continued confinement. In his response to Porter's grievance, Gilmore stated that Porter "will remain housed in the Capital Case Unit until directed otherwise." ECF No. 55-2 at 183. In addition, Gilmore acknowledged the impact of solitary confinement on Porter's mental health, and volunteered that additional mental health services were available upon request. Id. Under these circumstances, Defendants' Motion for Summary Judgment on the basis of Superintendent Gilmore's personal involvement is denied.

### 3. Conditions of Confinement

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII; Whitley v. Albers, 475 U.S. 312, 318–19 (1986). The United States Supreme Court has held that this prohibition imposes affirmative duties on prison officials to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)); and see Young v. Martin, 801 F.3d 172, 177 (3d Cir. 2015). It is well settled that prison conditions constitute cruel and unusual punishment if they result in serious deprivations of basic human needs. See Tillman v. Lebanon Cnty. Corr. Facility, 221 F.3d 410 (3d Cir. 2000). A condition of confinement implicates the Eighth Amendment if it is so reprehensible as to be deemed inhumane under contemporary standards or if it deprives an inmate of minimal civilized measures of the necessities of life. See Hudson v. McMillian, 503 U.S. at 8; Wilson v. Seiter, 501 U.S. 294, 298 (1991).

To find that an official has violated the Cruel and Unusual Punishments Clause, "[he] must have a 'sufficiently culpable state of mind.'" Farmer, 511 U.S. at 834. "In prison-conditions cases

that state of mind is one of 'deliberate indifference' to inmate health or safety." <u>Id.</u> This is a subjective inquiry. "A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u> at 837. "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,' a standard that incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions[.]' Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." <u>Id.</u> at 844-45.

Applying the above-noted established Eighth Amendment law to the facts of this case, Porter must present evidence of both that he was subjected to inhumane conditions and, second, that each Defendant knew or was aware that Plaintiff "faced a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." <u>Id.</u> at 847.

Porter contends that the risk of harm of long term solitary confinement is both inhumane and obvious. Certainly, societal standards in this regard have evolved over time. Porter relies upon <u>Williams</u>, where the Third Circuit "first acknowledge[d] the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement. [W]e observed a growing consensus—with roots going back a century— that [long term isolation] can cause severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of

the basic sense of self identity. And the damage does not stop at mental harm: 'Physical harm can also result. Studies have documented high rates of suicide and self-mutilation amongst inmates who have been subjected to solitary confinement. These behaviors are believed to be maladaptive mechanisms for dealing with the psychological suffering that comes from isolation.'" Palakovic v. Wetzel, 854 F.3d 209, 225–26 (3d Cir. 2017) (quoting Williams 848 F.3d at 567–68 (internal citations omitted)).

The obviousness of the risk alone, however, is not sufficient to impose liability. There must also be evidence that despite Secretary Wetzel's recognition that such "long term solitary confinement certainly could have negative effects on mental health," Johnson, 209 F. Supp. 3d at 779, and despite the various measures implemented to provide mental health treatment, both Defendants were individually aware that Porter suffered a substantial risk of harm and yet were deliberately indifferent. In this respect, Porter's claim fails.

Furthermore, Porter certainly presents a wealth of recent legal opinions that the risk of long term solitary confinement is obvious. Although this Court is certainly sympathetic to these risks, as discussed in Williams, unfortunately, nowhere in the record before this Court has Porter provided any evidence whatsoever of his alleged mental decomposition. There are no medical records, no mental health records, no evidence of counseling sessions or treatment for suicidal impulses provided to this Court. Further, the record establishes that because of the known risks of solitary confinement, several measures are in place at the CCU at SCI – Greene, where Porter is confined, to ensure the delivery of mental health treatment on a routine and frequent basis, as well as emergency measures that could, if necessary, result in an inmate's temporary removal from the CCU for interactive psychiatric and psychological care. ECF No. 55-2 at 59-60. Porter fails to present any evidence that these measures were utilized by him, or were unavailable to him, or even

that such measures would fail to ameliorate the harm alleged. Most critically, there is no evidence that either of the Defendants were aware that the care afforded or available was insufficient so as to place Porter at risk of further decline.[6]

Summary judgment is appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. <u>Id.</u> at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). In this instance, and after extensive discovery, the evidence mustered by Porter in opposition to the pending Motion for Summary Judgment fails to present a genuine issue for trial. Accordingly, the Defendants' Motion for Summary Judgment is granted.[7,8]

## IV.    CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment filed on behalf of Defendants Pennsylvania Department of Corrections; John E. Wetzel, Secretary for Department of Corrections; and Robert Gilmore, Superintendent of SCI – Greene, is properly granted. The

---

[6] The Court is compelled to note that the absence of evidence in this case starkly contrasts with <u>Johnson v. Wetzel</u>, 209 F. Supp. 3d 766 (2016), where plaintiff similarly alleged severe psychological deterioration in his complaint, but supported his allegations with a corroborating expert report and testimony of Dr. Craig Haney, a social psychologist. The evidence of record established that the plaintiff "deteriorated to the point of social death as a direct result of his continued isolation." <u>Id.</u> at 778.

[7] During a status conference with the parties, the Court discussed the pending class action lawsuit filed in the United States District Court for the Middle District of Pennsylvania, challenging the conditions of confinement facing all current and future death-sentenced prisoners in the Commonwealth of Pennsylvania. <u>Reid v. Wetzel</u>, No. 18-176 (M.D. Pa.). The Court's conclusion that Porter remains subject to an active sentence of death necessarily places his claims regarding the conditions of his confinement within the scope of the class action to permit further consideration based upon evidence obtained therein.

[8] In light of the disposition of Porter's Eighth Amendment conditions of confinement claim, the Court does not reach the issue of qualified immunity as a defense to Porter's claim.

Motion for Summary Judgment filed on behalf of Plaintiff Ernest Porter is denied. Accordingly, the following Order is entered:

## ORDER

AND NOW, this 8th day of November, 2018, upon consideration of the Motion for Summary Judgment filed on behalf of Defendants Pennsylvania Department of Corrections; John E. Wetzel, Secretary for Department of Corrections; and Robert Gilmore, Superintendent of SCI – Greene, and the Motion for Summary Judgment filed on behalf of Plaintiff Ernest Porter, as well as the briefs and exhibits filed in support and in opposition thereto,

IT IS HEREBY ORDERED that the Motion for Summary Judgment filed on behalf of all Defendants is GRANTED;

IT IS FURTHER ORDERED that the Motion for Summary Judgment filed on behalf of Plaintiff is DENIED;

IT IS FURTHER ORDERED that the Clerk of Court is to mark the case closed; and

IT IS FURTHER ORDERED that, pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, if the Plaintiff wishes to appeal from this Order he or she must do so within thirty (30) days by filing a notice of appeal as provided in Rule 3, Fed. R. App. P., with the Clerk of Court, United States District Court, 700 Grant Street, Room 3110, Pittsburgh, PA 15219.

BY THE COURT,

MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

cc:     All counsel of record by Notice of Electronic Filing